KENNETH T. LYONS & another[1] vs. NEWS GROUP BOSTON, INC.,[2] & others.[3]

Suffolk. January 6, 1993. - May 13, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, & GREANEY, JJ.

*Libel and Slander.*

In a libel action, the writers and publishers of a newspaper article and a person quoted therein were entitled to summary judgment where the statements challenged could be understood, in the circumstances, only as expressions of opinion that were based on disclosed or assumed nondefamatory facts and that did not imply defamatory facts. [276-277]

CIVIL ACTION commenced in the Superior Court Department on June 14, 1990.

Motions for summary judgment were heard by *John C. Cratsley,* J., and the case was reported by him to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*Barbara A. Lenk* (*Thomas W. Evans* with her) for News Group Boston, Inc., & another.

*Janis M. Berry* (*Richard D. Batchelder, Jr.,* with her) for Alexander Tennant.

*Neal M. Brown* (*Meryl A. Kukura* with him) for the plaintiffs.

LIACOS, C.J. This action arose out of the same core of operative facts as *Lyons* v. *Globe Newspaper Company, ante* 258 (1993) (*Lyons I*) decided today. We only discuss facts and legal questions not addressed in that opinion.

---

[1]National Association of Government Employees, Inc., doing business as International Brotherhood of Police Officers.

[2]Publisher of the Boston Herald newspaper.

[3]Robert Connolly and Alexander Tennant.

On June 8, 1990, the Boston Herald published an article about the picketing of the Massachusetts Democratic party's convention by a Springfield police union. The article's headline read: "GOP: SUPPORTERS OF SILBER BEHIND SPRINGFIELD ACTION." The article stated that Republican party officials charged that "supporters of Democratic gubernatorial candidate John Silber, including Senate President William Bulger, were behind the police demonstration that disrupted last weekend's Democratic State Convention." The article explained that the Republican party itself "faced a Democratic Party lawsuit alleging they were behind the disruption." The article quoted Alexander Tennant, who was described as the "GOP State Committee Executive Director," as saying: "It will become clearer and clearer that the Republican Party had nothing to do with this and that there was a conspiracy. . . . There is a lot of discussion that Billy Bulger was involved in this. We're still gathering facts." The article added that Tennant "offered no proof to back up the allegations."

After citing vehement denials of Tennant's allegations by spokesmen for Bulger and Silber, the article stated that "Tennant appeared on radio talk shows yesterday and made cryptic references to a 'Chuck Stuart' wrinkle in the convention saga. In this case, the suggestion is that the Democrats — now seen in some quarters as the victims of a GOP Watergate-style dirty trick — in the end will be revealed as the perpetrators. According to the theory advanced by Tennant — and mentioned widely on Beacon Hill — Kenneth Lyons, a Silber supporter and head of the National Association of Government Employees, served as the intermediary between the Silber campaign and the Springfield Police union."

On June 14, 1990, the plaintiffs commenced the present case in the Superior Court. Their complaint set forth arguments which essentially parallel those which they advanced in *Lyons I*. The plaintiffs' complaint named News Group Boston, the publisher of the Boston Herald newspaper, two of its reporters (Connolly and Miga), and Tennant. Tennant

subsequently counterclaimed against Lyons for abuse of process, violation of the Massachusetts Civil Rights Act, and attorney's fees pursuant to G. L. c. 231, § 6 (*f*) (1990 ed.). All defendants moved for summary judgment on the libel counts pursuant to Mass. R. Civ. P. 56, 365 Mass. 754 (1974). The plaintiffs also moved for partial summary judgment on these counts. On October 29, 1992, a Superior Court judge denied all of these motions except for that of Miga.[4] The judge then reported to the Appeals Court "the correctness of [his] interlocutory orders denying the aforesaid motions for summary judgment." We granted the parties' joint application for direct appellate review.

We hold that the challenged statements could be understood only as expressions of opinion and reasonably could not be construed to state facts. See *Myers* v. *Boston Magazine Co.*, 380 Mass. 336, 339 (1980).[5] The article plainly cautioned the reader that the allegedly defamatory statements constituted a "theory," a word connoting "abstract knowledge" or "speculation." Webster's Third New Int'l Dictionary 2371 (2d ed. 1959). The article confirmed this message by stating that the proponent of the theory "offered no proof to back up the allegations."[6] The challenged statements appeared in an article devoted to setting forth two alternative theories with respect to the picketers' motives. Finally, the challenged statements were uttered in the midst of a political controversy, an occasion where readers expect heated debate and self-serving assertions. See *Lyons I, supra* at 264.[7]

---

[4]The allowance of this motion is not before us today.

[5]As we did in *Lyons* v. *Globe Newspaper Co., ante* 258 (1993), we assume for the sake of argument that the challenged statements were defamatory.

[6]Tennant was quoted as plainly stating that he was "still gathering facts."

[7]Like the Boston Globe's quoted comparison of the picketing to the Sandinistas' practices, the references in the article challenged here to Charles Stuart and to the Watergate scandal — as well as the characterization of the picketing as "Nazi strong-arm methods" — amounted to nothing more than nonactionable verbal abuse. See *Lyons I, supra* at 264, n.6.

For the same reasons as in *Lyons I,* we hold that these expressions of opinion were based on disclosed or "assumed" nondefamatory facts and did not imply undisclosed defamatory facts. Restatement (Second) of Torts § 566 (1977). In addition to the disclosed facts described above, the article relied on the following assumed facts. Silber needed to obtain 15% of the delegates' vote at the convention in order to qualify for the party's primary ballot; before the convention, uncertainty had reigned with respect to Silber's ability to garner these votes; the picketing threatened to cancel the convention, an occurence which might have eliminated the 15% requirement. These facts had been reported in the Boston Globe article which the plaintiffs challenged in *Lyons I* as well as and in various other news reports. See *King* v. *Globe Newspaper Co.,* 400 Mass. 705, 713 (1987), cert. denied, 485 U.S. 940 & 962 (1988) (challenged cartoon relied on facts stated in article published on previous day). In addition, these facts form the very basis for the plaintiffs' argument that the Herald article and Tennant's statements defamed them.

Accordingly, we hold that the defendants' motions for summary judgment should have been allowed.

*So ordered.*